Filed 3/10/16  P. v. Sanchez CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D067336 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN248486) |
| RENE SANCHEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Robert J. Kearney, Judge.  Affirmed.

David M. McKinney, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Marilyn L. George, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found defendant guilty of committing first degree murder and attempted murder when he was 16 years old.  With enhancements, the trial court sentenced

defendant to 50 years to life on the murder count. On appeal, defendant contends this sentence constitutes cruel and unusual punishment because it is the functional equivalent of life without the possibility of parole (LWOP), and the trial court did not consider the youth-related factors articulated by the United States Supreme Court in *Miller v. Alabama* (2012) 567 U.S. __ [132 S.Ct. 2455] (*Miller*) before imposing the sentence. Based on the United States Supreme Court's decision in *Montgomery v. Louisiana* (2016) 577 U.S. __ [136 S.Ct. 718] (*Montgomery*), which was decided while this appeal was pending, we conclude that Penal Code section 3051,[1] which will provide defendant a parole hearing during his 25th year of incarceration, remedies any *Miller* violation.

Defendant also challenges the sufficiency of the evidence supporting the jury's finding that he committed the murder with premeditation and deliberation, and asserts a variety of instructional errors. We reject these contentions and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Overview*

On October 27, 2007, Ana and Rafael Nava hosted a family-oriented Halloween party at their home near Dixon Lake in Escondido, California. The area was not known for gang activity. One of the invited guests, Natalie Gonzalez, left the party and returned later with a few friends, at least two of whom were gang members. Defendant, then 16, was one of them. When Ana told Gonzalez's friends to leave because they were disrespecting her house, a fight broke out and defendant shot two guests, killing one (Carlos Estrada) and injuring the other (Rudy Garcia). The other gang member (Jaime

---

[1] All further statutory references are to the Penal Code.

Reyes) stabbed Ana twice as Gonzalez's group fled.  Defendant fled to Mexico and was not extradited until 2013.

In July 2014, the People filed a three-count information charging defendant with the murder of Estrada (count 1; § 187, subd. (a)), and the attempted murders of Garcia and Ana (counts 2 and 3, respectively; §§ 664, 187, subd. (a)).  The information alleged gang enhancements for all three counts (§ 186.22, subd. (b)(1)); firearm enhancements as to counts 1 and 2 (§§ 12022.53, subds. (d) & (e)(1)); and a great-bodily-injury enhancement as to count 2 (§ 12022.7, subd. (a)).

B.  *The Prosecution Case*

1.  *The Eyewitnesses' Testimony*

Ana and her then-husband Rafael hosted the Halloween party on October 27, 2007 (the Saturday before Halloween) at their Escondido home.  Between 15 and 30 people attended; most were in their 30's, wore costumes, and had young children.

Ana's "good friend" Gonzalez attended the party.  Gonzalez left the Navas' party around 8:00 p.m. to go to another party.  She later called Ana to ask if she could return with a few other people.  Ana responded that it was a family party, but Gonzalez could bring guests if she vouched for them.

Gonzalez returned to the Navas' party around 10:00 or 11:00 p.m. with a group of four or five Latino males and females ranging in age from their teens to early 30's.  The group headed straight to the Navas' backyard, where other guests were convened.  Several of the Navas' guests thought the males in Gonzalez's group "looked like thugs" and gang members.  The oldest male (later identified as Reyes) appeared to be in his

3

early 30's and was wearing a beanie on his shaved head. One of the younger males (later identified as Jose Lopez) wore a gas mask and a gas mask-themed t-shirt. Defendant wore a blue hat with a San Diego logo on his shaved head.

There was "tension" as soon as the new group arrived. One of the newcomers was asking guests what they "claim," which one guest interpreted as referring to gang affiliation. One of the Navas' daughters saw members of the group going into the bathroom together, which she felt was disrespecting the house. Another guest, Moises Ariza, saw the Navas' friend Estrada "bickering" with someone (possibly a member of the new group) in the backyard. Ariza went inside and whispered to Rafael about it as a courtesy. The look on Rafael's face indicated to Ana and the daughter that he was concerned. Rafael told Ana to stay inside, but she followed him to the backyard.

Meanwhile, Leticia Ramirez—who came to the party with Gonzalez, was Reyes's girlfriend, and is Lopez's aunt—saw Reyes becoming upset. Ramirez knew that Reyes and defendant were members of the "Diablos" criminal street gang, and that Reyes would not tolerate disrespect.[2] A man whom Reyes believed to be a member of the rival "Westside" gang was giving him dirty looks, and Ramirez heard that people at the party were saying the Diablos are "bitches." Reyes approached the man, then returned and told Ramirez there would not be any problems because children were present. Ramirez saw the man speaking to other men and pointing toward Reyes.

---

[2]     Reyes and defendant are cousins. Reyes's gang moniker is "Big Ghost"; defendant's is "Little Ghost."

Between 10 and 20 minutes after Gonzalez's group first arrived at the party, Rafael and Estrada approached them in the backyard. When Ana saw them argue and heard one of the male newcomers say "Diablos" in an "unfriendly" way, she approached the group and said, "I don't know who the fuck you are, but I need you to get the fuck out of my house. You are disrespecting my house." She added, "Nobody claims here. This is a family party." Reyes stood up and asked, "Who the fuck are you?"[3] Ana replied, "This is my house. I am the owner. You need to get the fuck out."

A fistfight broke out, followed by four to eight rapid gunshots. Estrada was struck by five bullets and was on the ground with blood "gushing out." Rafael's nephew, Rudy Garcia, was also hit by a bullet. He got on his hands and knees and tried to comfort Estrada, then began vomiting blood. As Ana and others fled down the sideyard toward the front of the house, Reyes pinned her against the wall, stabbed her twice in the breast area, and ran off.

The three victims were transported to the hospital. Estrada died sometime after midnight. Garcia underwent emergency surgery to treat wounds that would otherwise have been fatal. Ana underwent surgery for a collapsed lung and fluid in her lungs, conditions that could have been fatal without medical intervention.

Ramirez fled the party alone. When she reached the Navas' front yard, another of her friends (who had been at the party and had fled) drove up and asked if she wanted a ride. Ramirez accepted. As they drove off, Ramirez spoke by phone with Reyes,

---

3      Some witnesses identified the man in the gas mask (Lopez) as the person who confronted Ana, while others said two men did.

whereupon she directed her friend to drive a few blocks away to pick up defendant and Reyes. Ramirez's friend had met up with her and three male members of her group earlier that evening. He thought the three males looked like gang members. He described defendant as wearing a blue baseball cap with an "SD" logo on it, and having a tattoo of a written word on the back of his neck. Another was wearing a gas mask. The friend identified defendant at trial.

When defendant and Reyes got in the car, they were sweaty and breathing heavily. Ramirez directed her friend to Reyes's house. On the way, the friend heard Ramirez ask defendant, "Was that a real gun?" Defendant responded, "No, don't worry about it. Don't worry about it. It's not a real gun."[4] The friend dropped the passengers at Reyes's house, and never saw them again. Within a day or two, Reyes and Ramirez went to Tijuana; Reyes left Ramirez there a few weeks later, and she has not seen him since.[5]

Ana and Garcia initially described the shooter to police as a male wearing a gas mask. At trial, Ana testified she did not see who the shooter was, but said it was not the male wearing the gas mask. She explained that she gave her conflicting initial description to one of the first-responding police officers while lying on her garage floor after having been stabbed. Similarly, Garcia testified at trial that he had no idea who the

---

[4]     At trial, Ramirez testified she did not remember this exchange with defendant, and denied having ever told authorities about it. However, when confronted with a police report memorializing the exchange, Ramirez acknowledged it probably did occur, but she did not know why she would have asked defendant about the gun.

[5]     Ramirez was arrested and charged with being an accessory to the shooting, but the charges were eventually dismissed.

shooter was, and explained that he gave his initial description to police at the hospital just days after his surgery while he was on a morphine drip.

Two other trial witnesses identified defendant as the shooter. Moises Ariza described the shooter as a Hispanic male, 5'2" to 5'5" tall, 16 to 19 years old, and wearing a baseball cap and a gray sweater. Ariza did not see the gun, but heard "pops" and saw "muzzle fire" coming from the outstretched sleeve of a hoodie sweatshirt. The shooter appeared to be pointing the gun at Estrada from about three or four feet away. Ariza said the male wearing the gas mask was not the shooter.

The Navas' daughter's boyfriend testified he was at the party and had an unobstructed view of the shooting from about 15 feet away. He said the argument ended when he saw "sparks" coming from the shooter's hand. The boyfriend described the shooter as a 17- or 18-year-old Latino or Mexican male wearing a San Diego Padres baseball cap.[6]

Initial statements identifying the shooter as the male wearing a gas mask led police to Lopez, who identified defendant as the shooter after being told witnesses had identified Lopez as the shooter. Lopez said defendant was wearing a blue San Diego Padres baseball cap on the night of the incident. Lopez identified defendant in a photographic lineup and knew him by name as Reyes's cousin.

---

[6] The boyfriend acknowledged on cross-examination that he initially told police he thought the shooter was in his 20's. The boyfriend was unable to identify defendant in a photographic lineup.

7

Lopez recanted at trial. He acknowledged he may have previously told police that he saw a muzzle flash came from defendant's waistband, but denied it at trial and claimed police pressured him into implicating defendant. He testified he was a dishonest person and that he was under the influence of methamphetamine and alcohol on the day of the incident. Lopez admitted he was currently incarcerated on other charges, and that he was in protective custody out of concern that something might happen to him—such as being beaten, stabbed, or killed—for testifying against a gang member.

## 2. *The Gang Expert's Testimony*

Escondido Police Detective Jeffrey Valdivia testified as an expert on gangs. He described the Diablos as a territorial Hispanic gang in Escondido that meets the statutory definition of a criminal street gang. Diablos gang graffiti was commonly "EVD" or "VEVD" for "Varrio Esco Viejo Diablos." The Diablos' primary color is blue, and members frequently wear San Diego Padres or Chargers baseball caps to reflect their association with the San Diego region. The Westside gang is a rival of the Diablos.

Detective Valdivia explained the concept of "putting in work" as committing crimes for the benefit of the gang—the more violent the crime, the better, because gang members equate violence with fear, which they further equate with respect. A gang member who believes he has been disrespected will usually respond violently because a loss of respect reflects poorly on both the gang and the member. Younger gang members who want to put in work and increase their status in a gang will often carry a weapon (and let fellow gang members know it) to indicate their willingness to be violent.

Gang members generally assume that any young Hispanic males are also gang members, and will ask questions like, "Do you bang?" "Where you from?" or "What do you claim?" to determine someone's gang affiliation. Gang members will generally throw out a hand sign or shout the name of their gang just before or after an assault.

Defendant was a documented member of the Diablos. During one police contact in 2006, he was wearing a blue Detroit Tigers baseball cap with the letter "D" on the front (for "Diablos"). During another police contact in 2007, defendant had "Escondido" tattooed on the back of his neck in old-English-type script. When he was arrested in 2013, the tattoo had been altered to that of a woman; the word Escondido was no longer apparent.

In a hypothetical shooting similar to the facts of this case—with gang rivals potentially present at the same party and the hostess disrespecting gang members by telling them to "get the fuck out"—Detective Valdivia opined that a younger gang member shooting the perceived rival would be a crime that was committed for the benefit of and in association with the gang. The detective explained that if a gang member just got up and left, he would be perceived as weak, particularly if the other gang members knew he was armed with a gun and did not use it. The shooting in this scenario promoted the gang because it reinforced the concepts of "fear and respect [that] are essential to the existence and survival of the gang."

### 3. *Defendant's Arrest and Extradition*

United States Marshals received information about defendant staying in a small town near Tecate, Mexico. A search of a house in that town yielded mail with

9

defendant's name on it, and the words "Escondido" and "Diablos" were written on papers and on a wall. Mexican authorities eventually apprehended defendant, and he was extradited to the United States in 2013.

C. *The Defense Case*

Defendant presented two witnesses at trial: the patrol officer to whom Ana initially described the shooter as a male wearing a gas mask, and the detective to whom Garcia initially described the shooter as a male wearing a "gas-mask-type costume."

D. *Jury Verdict and Sentencing*

After hearing witness testimony over six court days, the jury deliberated for approximately nine hours before returning its verdict. The jury found defendant guilty of the first degree murder of Estrada, as alleged in count 1; guilty of the attempted murder of Garcia, as alleged in count 2; and not guilty of the attempted murder of Ana, as alleged in count 3. The jury found true the gang, firearm, and great-bodily-injury enhancements alleged in connection with counts 1 and 2.

During defendant's sentencing hearing, the prosecutor discussed aspects of defendant's youth and upbringing, as articulated by the Supreme Court in *Miller, supra*, 132 S.Ct. 2455. He noted defendant's age; argued defendant was not impetuous; argued defendant was not influenced by peers, but rather took the lead in the attack; noted defendant's "family raised him right" and his home life did not appear to be dysfunctional; and noted defendant did not have any psychological or psychiatric issues. Defense counsel countered that the probation department's recommended sentence of 50

10

years to life violates *Miller* because it is the functional equivalent of imposing LWOP on a juvenile offender.

Noting the absence of evidence regarding defendant's life expectancy, the trial court concluded *Miller* and related cases did not apply.  Based on that conclusion, the court sentenced defendant to 50 years to life without discussing the *Miller* factors.[7]  The court noted defendant will be eligible for parole during his 25th year of incarceration under section 3051, subdivision (b)(3), but added:  "I did not select the 50 years to life relying on that to make it compliant with the Eighth Amendment, but it is a factor to be considered.  [¶]  I do think, even if that did not exist, the court sentence would be appropriate."

DISCUSSION

I.  *Defendant's Sentence Is Not Cruel and Unusual*

Defendant, who was 16 years old when he committed his crimes (though 23 when sentenced because he fled and was a fugitive in Mexico for six years), contends his sentence of 50 years to life on the murder count is the functional equivalent of LWOP because he will not be eligible for parole until he is 73—a year after his projected life expectancy.  He argues the trial court's imposition of this sentence without considering

_____

7    The sentence consists of the following:  25 years to life on the murder count, plus 25 years to life for committing the murder with a firearm (but no time for the gang enhancement); and five years on the attempted murder count, plus 10 years for the gang enhancement, plus 25 years to life for the firearm enhancement, plus three years for the great-bodily-injury enhancement, all to be served concurrently with the sentence on the murder count (with the exception of the great-bodily-injury enhancement, which the trial court stayed under section 654).

11

the youth-related factors articulated by the United States Supreme Court in *Miller, supra*, 132 S.Ct. 2455 renders the sentence cruel and/or unusual under the federal and state Constitutions.

The Attorney General counters that section 3051, subdivision (b)(3), which the Legislature enacted in response to *Miller* and related cases, moots defendant's challenge by guaranteeing him a parole hearing during his 25th year of incarceration, when he will be 48 years old. The Attorney General argues that such a sentence "can no longer be characterized as the functional equivalent of a life sentence without the possibility of parole," and, thus, defendant's sentence is constitutional.

The parties correctly observe in their briefing that the argument advanced by the Attorney General—adopted by some Courts of Appeal and rejected by others (including this court)—is currently pending before the California Supreme Court. (See *In re Alatriste* and *In re Bonilla* (2013) 220 Cal.App.4th 1232, review granted Feb. 19, 2014, S214652 (*Alatriste*), S214960 (*Bonilla*); *People v. Franklin* (2014) 224 Cal.App.4th 296, review granted June 11, 2014, S217699; *In re Heard* (2014) 223 Cal.App.4th 115, review granted, Apr. 30, 2014, S216772.) Although the California Supreme Court has not yet resolved the issue, the United States Supreme Court has, in an opinion filed while this appeal was pending. (*Montgomery, supra*, 136 S.Ct. 718.) In *Montgomery*, the court held that "a [s]tate may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole" under statutes like section 3051. (*Id.* at p. 736.) Thus, even if the trial court's sentence violated *Miller*, section 3051 remedies that violation by providing defendant a parole hearing during his 25th year of incarceration.

12

A. *Overview of Juvenile Sentencing Precedent*

The Eighth Amendment to the United States Constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." This constitutional provision "guarantees individuals the right not to be subjected to excessive sanctions." (*Roper v. Simmons* (2005) 543 U.S. 551, 560 (*Roper*).) This right "flows from the basic ' "precept of justice that punishment for [a] crime should be graduated and proportioned to [the] offense." ' " (*Ibid.*) Article I, section 17 of the California Constitution likewise proscribes "[c]ruel or unusual punishment."

In *Roper*, the United States Supreme Court held that it is cruel and unusual punishment to impose the death penalty on a defendant who committed a crime when under the age of 18. (*Roper, supra*, 543 U.S. at p. 568.) The court explained there are "[t]hree general differences between juveniles under 18 and adults [that] demonstrate that juvenile offenders cannot with reliability be classified among the worst offenders." (*Id.* at p. 569.) First, "scientific and sociological studies . . . tend to confirm, '[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions.' " (*Ibid.*) Second, "juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure." (*Ibid.*) Third, "the character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed." (*Id.* at p.

13

570.)  The *Roper* court concluded that "[t]hese differences render suspect any conclusion that a juvenile falls among the worst offenders."  (*Ibid*.)

In *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*), the United States Supreme Court extended *Roper*'s rationale by holding that it is cruel and unusual punishment to impose LWOP—" 'the second most severe penalty permitted by law' " (*id.* at p. 69)—on a defendant who committed a *nonhomicide* offense while under the age of 18.  (See *id.* at p. 74.)  The court clarified, however, that "a [s]tate is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide offense"; it need only "give defendants . . . some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation."  (*Id*. at p. 75.)

Building on *Roper* and *Graham*, the United States Supreme Court held in *Miller* that it is cruel and unusual punishment to impose *mandatory* LWOP on a juvenile *homicide* offender.  (*Miller, supra*, 132 S.Ct. at p. 2460.)  This is so, the court explained, because *mandatory* LWOP "precludes consideration of [a juvenile offender's] chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences.  It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional.  It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him.  Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on

14

a plea agreement) or his incapacity to assist his own attorneys. [Citations.] And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it." (*Id.* at p. 2468.) The *Miller* court elaborated: "[G]iven all we have said in *Roper*, *Graham*, and this decision about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon. That is especially so because of the great difficulty we noted in *Roper* and *Graham* of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' [Citations.] Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Id*. at p. 2469.)

In *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*), the California Supreme Court applied the principles announced in *Roper*, *Graham*, and *Miller* and "conclude[d] that sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy"—a so-called de facto or functional equivalent of an LWOP—"constitutes cruel and unusual punishment in violation of the Eighth Amendment." (*Id*. at p. 268.)[8]

---

[8]     The court made clear that its holding applied only to nonhomicide offenses: "We leave *Miller*'s application in the homicide context to a case that poses the issue." (*Caballero, supra*, 55 Cal.4th at pp. 267-268, & 268, fn. 4.)

These cases provide clear rules for sentencing juveniles in most cases:  (1) a juvenile cannot be sentenced to capital punishment for any crime (see *Roper, supra*, 543 U.S. at pp. 578-579); (2) a juvenile cannot be sentenced to LWOP or its functional equivalent for *nonhomicide* offenses (see *Graham, supra*, 560 U.S. at p. 75; *Caballero, supra*, 55 Cal.4th at p. 268); (3) a juvenile cannot be sentenced to *mandatory* LWOP, even for a homicide (see *Miller, supra*, 132 S.Ct. at p. 2464); and (4) a juvenile may be sentenced to LWOP for a homicide only if the court considers the " 'mitigating qualities of youth' " and only imposes this sentence on those "rare juvenile offender[s] whose crime[s] reflect[ ] irreparable corruption" (*id*. at pp. 2467, 2469).

### B.   *Senate Bill No. 260*

In response to the developing case law on juvenile sentencing, the Legislature passed Senate Bill No. 260 effective January 2014.  (Stats. (2013) ch. 312, § 4.) Section 1 states in relevant part:  "The Legislature finds and declares that, as stated by the United States Supreme Court in *Miller*[*, supra*, 132 S.Ct. 2455] . . . , 'only a relatively small proportion of adolescents' who engage in illegal activity 'develop entrenched patterns of problem behavior,' and that 'developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds,' including 'parts of the brain involved in behavior control.'  The Legislature recognizes that youthfulness both lessens a juvenile's moral culpability and enhances the prospect that, as a youth matures into an adult and neurological development occurs, these individuals can become contributing members of society.  The purpose of this act is to establish a parole eligibility mechanism that provides a person serving a sentence for crimes that he or she

16

committed as a juvenile the opportunity to obtain release when he or she has shown that he or she has been rehabilitated and gained maturity, in accordance with the decision of the California Supreme Court in *People v. Caballero[, supra,]* 55 Cal.4th 262 and the decisions of the United States Supreme Court in *Graham[, supra,]* 560 U.S. 48 . . . , and *Miller*[*, supra*, 132 S.Ct. 2455] . . . ."  (Sen. Bill No. 260 (2013-2014 Reg. Sess.) § 1, pp. 2-3.)

Senate Bill No. 260 enacted new section 3051.  (See Stats. (2013) ch. 312, § 4.) With certain exceptions not applicable here, section 3051 provides an opportunity for a juvenile offender to be released on parole irrespective of the sentence imposed by the trial court by requiring the Board of Parole Hearings (Board) to conduct "youth offender parole hearing[s]" on a set schedule depending on the length of the prisoner's sentence. As relevant here, for a sentence of 25 years to life, the hearing will be held during the 25th year of incarceration.  (§ 3051, subd. (b)(3).)  If parole is not granted during the initial hearing, the Board will set a subsequent hearing in accordance with a statutory schedule.  (See § 3051, subd. (g).)

C.  *Analysis*

Assuming without deciding the trial court erred in failing to consider the *Miller* factors when sentencing defendant, we conclude any *Miller* violation is remedied by section 3051.  Although this court previously concluded section 3051 does not excuse a sentencing court from undertaking a *Miller* analysis when *Miller* applies (see *In re Heard, supra*, 223 Cal.App.4th 115, review granted Apr. 30, 2014, S216772), the United

17

States Supreme Court's intervening *Montgomery* decision fundamentally alters that analysis.[9]

In *Montgomery*, the petitioner (Henry Montgomery) was sentenced to mandatory LWOP for shooting and killing a sheriff's deputy in 1963 when Montgomery was 17 years old. (See *Montgomery, supra*, 136 S.Ct. at pp. 725-726.) After the United States Supreme Court issued *Miller*—"[a]lmost 50 years after Montgomery was first taken into custody (*Montgomery*, at p. 726)—Montgomery sought collateral review of his sentence in state court. (*Ibid*.) The trial court denied Montgomery's motion on the basis that *Miller* does not apply retroactively; the Louisiana Supreme Court denied Montgomery's application for a supervisory writ; and the United States Supreme Court granted certiorari. (*Montgomery,* at p. 727.) The high court held that *Miller* announced a substantive rule of constitutional law that applies retroactively. (*Montgomery*, at p. 736.)

The Supreme Court found that giving *Miller* retroactive effect will not be too onerous on the states because they can simply give affected prisoners a parole hearing:

> "Giving *Miller* retroactive effect, moreover, does not require [s]tates to relitigate sentences, let alone convictions, in every case where a juvenile offender received mandatory life without parole. *A [s]tate may remedy a* Miller *violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them.* See, e.g., Wyo. Stat. Ann. § 6-10-301(c) (2013) (juvenile homicide offenders eligible for parole after 25 years). Allowing those offenders to be considered for parole ensures that juveniles whose crimes reflected only transient immaturity—and who have since matured—will not be forced to serve a disproportionate sentence in violation of the Eighth Amendment.

---

9     We requested and received supplemental briefing from the parties regarding *Montgomery*'s impact on this case.

"Extending parole eligibility to juvenile offenders does not impose an onerous burden on the [s]tates, nor does it disturb the finality of state convictions. Those prisoners who have shown an inability to reform will continue to serve life sentences. The opportunity for release will be afforded to those who demonstrate the truth of *Miller*'s central intuition—that children who commit even heinous crimes are capable of change." (*Montgomery, supra*, 136 S.Ct. at p. 736, italics added.)

Thus, assuming the trial court violated *Miller*, *Montgomery* holds that the violation can be remedied by providing defendant an opportunity for parole—an opportunity expressly provided by section 3051. And that opportunity is not an all-or-nothing proposition, as defendant will receive an additional hearing if he is unsuccessful during the initial one. (§ 3051, subd. (g).)

We recognize that the *Miller* violation in *Montgomery* occurred because Montgomery was sentenced long before *Miller* was decided, whereas the assumed violation here occurred because the trial court concluded *Miller* is inapplicable to defendant's sentence. But we find this distinction immaterial. To the sentenced defendant, it matters only that his rights under *Miller* were not considered, whatever the reason. We find more compelling the fact that the Supreme Court deemed it an adequate remedy to provide Montgomery with a parole hearing after nearly *50 years* of incarceration, whereas here defendant will have a hearing after being incarcerated for about only half as long.

The overarching theme of *Roper*, *Graham*, and *Miller* is the recognition of "children's diminished culpability and heightened capacity for change," such that a sentencing court must attempt to distinguish "between 'the juvenile offender whose crime

19

reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' " (*Miller, supra*, 132 S.Ct. at p. 2469.) When a sentencing court fails to undertake this analysis at the outset, *Montgomery* holds that statutes (like § 3051, subd. (b)(3)) provide juvenile offenders an adequate remedy by ensuring "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." (*Graham, supra*, 560 U.S. at p. 75; see *Montgomery, supra*, 136 S.Ct. at p. 736.) Accordingly, defendant's sentence is not cruel and/or unusual.

II. *Sufficiency of Evidence Regarding Premeditation/Deliberation*

Defendant challenges the sufficiency of the evidence supporting the jury's finding of premeditation and deliberation underlying his conviction for first degree murder. He asserts that because there was evidence of provocation and a physical altercation before the shooting, the record supports, at most, a conviction for second degree murder. We disagree.

"In reviewing a sufficiency of evidence claim, the reviewing court's role is a limited one. ' "The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]" ' " (*People v. Smith* (2005) 37 Cal.4th 733, 738-739.) This standard is the same regardless of whether the People rely primarily on circumstantial evidence. (See *People v. Bean* (1988) 46 Cal.3d 919, 932.)

20

The crime of murder requires proof that the defendant killed a human being with malice aforethought. (§ 187, subd. (a).) Malice is shown "when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature." (§ 188.) An unlawful "willful, deliberate, and premeditated killing" is murder in the first degree. (§ 189.) " 'A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill . . . . "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance. [Citations.] "The process of premeditation and deliberation does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.' [Citations.]" ' " (*People v. Young* (2005) 34 Cal.4th 1149, 1182 (*Young*).)

In *People v. Anderson* (1968) 70 Cal.2d 15, 26-27, the California Supreme Court "surveyed prior cases and developed guidelines to aid reviewing courts in assessing the sufficiency of the evidence to sustain findings of premeditation and deliberation." (*Young, supra*, 34 Cal.4th at pp. 1182-1183.) "The court identified three categories of evidence pertinent to this analysis: planning, motive, and manner of killing." (*Id.* at p. 1183.) "With respect to these categories, the *Anderson* court stated: ' "Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of [planning] or evidence of [motive] in conjunction with [evidence of] either [planning] or [manner of killing]." ' " (*Ibid*.)

21

The California Supreme Court has also cautioned that " '[u]nreflective reliance on *Anderson* for a definition of premeditation is inappropriate. The *Anderson* analysis was intended as a framework to assist reviewing courts in assessing whether the evidence supports an inference that the killing resulted from preexisting reflection and weighing of considerations. It did not refashion the elements of first degree murder or alter the substantive law of murder in any way.' [Citation.] In other words, the *Anderson* guidelines are descriptive, not normative. 'The *Anderson* factors, while helpful for purposes of review, are not a sine qua non to finding first degree premeditated murder, nor are they exclusive.' " (*People v. Koontz* (2002) 27 Cal.4th 1041, 1081.) Reviewing courts "need not accord [the *Anderson* factors] any particular weight." (*Young, supra*, 34 Cal.4th at p. 1183.)

Considering the appellate record in its entirety and in light of the *Anderson* factors, we conclude substantial evidence supports the jury's finding of premeditation and deliberation. Regarding planning, defendant brought a loaded handgun to the party. (See, e.g., *People v. Villegas* (2001) 92 Cal.App.4th 1217, 1222, 1224 [fact that gang member was armed relevant to planning even though he did not expect to encounter his victim—a rival gang member—on the day of the shooting]; *People v. Ramos* (2004) 121 Cal.App.4th 1194, 1208 [gang members arming themselves before party and parking around corner relevant to planning].) Detective Valdivia testified that defendant's fellow gang member would have known defendant was armed and would have expected defendant to use his weapon if anyone disrespected their gang. (See, e.g., *Ramos*, at p. 1208 [expert testimony that "gang members are expected to defend each other and shoot

22

anyone who disrespected a fellow member of the gang" relevant to planning].) Tension arose as soon as defendant and his group arrived, made their gang affiliation known, and suspected that associates of the rival Westside gang were present and were disrespecting the Diablos. Yet, defendant, who was armed with a loaded handgun, remained at the party for another 10 to 20 minutes before the shooting.

As to motive, we disagree with defendant's assertion that "there is virtually no relevant evidence . . . apart from responding to the provocation of a fistfight." To the contrary, the following evidence supports a finding that the shooting was gang-motivated: (1) Detective Valdivia testified regarding the significance of respect in gang culture and the personal (particularly to a younger gang member) and organizational motivations in maintaining it; (2) the shooting occurred after defendant's group made their gang affiliation known and suspected that rivals were disrespecting them; and (3) the shooting occurred after someone in defendant's group said "Diablos" to Rafael and Estrada, which Detective Valdivia said is a common gang practice. (See, e.g., *Villegas, supra*, 92 Cal.App.4th at p. 1224.)

Because we have found "evidence of [motive] in conjunction with [evidence of] . . . [planning]," we need not consider whether the "manner of killing" further supports the jury's finding of premeditation and deliberation. (See *Young, supra*, 34 Cal.4th at p. 1183.) We note, however, that some courts have found that firing multiple gunshots at a vital area of the body from close range, as occurred here, supports a finding of premeditation and deliberation. (See, e.g., *People v. Francisco* (1994) 22 Cal.App.4th 1180, 1192; *People v. Koontz, supra*, 27 Cal.4th at p. 1082.)

23

III.  *Instructing the Jury With CALCRIM No. 359 Regarding Corpus Delicti*

Defendant asserts the trial court erred for two reasons by instructing the jury with CALCRIM No. 359, which requires that a defendant's out-of-court statements be corroborated when used to establish the corpus delicti, but not when offered to identify the defendant as the perpetrator.  First, defendant asserts the trial court should not have given the instruction *at all* because it "requires that a defendant have made a confession or admission indicating a crime had been committed, and in this case, no such statement was made."  Second, defendant asserts the trial court erred by "giving the jury a confusing and conflicting instruction" that "told the jury both that an accused . . . could not be convicted by extrajudicial statements alone (i.e., the corpus delicti rule), but then went on to say that [defendant's] identity as the perpetrator . . . could, in fact, be established by his extrajudicial statement alone."  Neither argument is persuasive.

A.  *Overview of the Corpus Delicti Rule*

"In every criminal trial, the prosecution must prove the corpus delicti, or the body of the crime itself—i.e., the fact of injury, loss, or harm, and the existence of a criminal agency as its cause.  In California, it has traditionally been held, the prosecution cannot satisfy this burden by relying *exclusively* upon the extrajudicial statements, confessions, or admissions of the defendant."  (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1168-1169 (*Alvarez*).)  "Virtually all American jurisdictions have some form of rule against convictions for criminal conduct not proven except by the uncorroborated extrajudicial statements of the accused."  (*Id.* at p. 1169.)  "This rule is intended to ensure that one will

24

not be falsely convicted, by his or her untested words alone, of a crime that never happened." (*Ibid*.)

"The independent proof may be circumstantial and need not be beyond a reasonable doubt, but is sufficient if it permits an inference of criminal conduct, even if a noncriminal explanation is also plausible." (*Alvarez, supra*, 27 Cal.4th at p. 1171.) "[O]nce the necessary quantum of independent evidence is present, the defendant's extrajudicial statements may then be considered for their full value to strengthen the case on all issues." (*Ibid*.)

"Whenever an accused's extrajudicial statements form part of the prosecution's evidence, the cases have additionally required the trial court to *instruct* sua sponte that a finding of guilt cannot be predicated on the statements alone." (*Alvarez, supra*, 27 Cal.4th at p. 1170.)

## B. *Background*

During a discussion about jury instructions, the trial court informed counsel it intended to instruct the jury regarding the corpus delicti rule based on Ramirez's friend's testimony that Ramirez asked defendant, "Was that a real gun?", to which defendant responded, "No, don't worry about it. Don't worry about it. It's not a real gun."

Defense counsel objected, arguing the statement attributed to defendant "is so minimal and vague and subject to so many interpretations, and, itself, is not even close to being an admission or a confession to any crime having been committed, that to tell the jury that any other evidence that would be needed to corroborate it need only be slight is just not accurate."

25

The trial court responded, "Well, it doesn't require that it be a confession. An admission, by definition, is any statement offered against a party opponent. [¶] I believe it's a correct statement of the law. I believe it tells the jury that that's a portion of the evidence they can consider, but they can't convict him based upon that alone." The court concluded it had a sua sponte duty to instruct the jury regarding the corpus delicti rule, and instructed the jury with the 2014 revision of CALCRIM No. 359 as follows:

> "The defendant may not be convicted of any crime based on his out-of-court statements alone. You may rely on the defendant's out-of-court statements to convict him only if you first conclude that other evidence shows that the charged crime or a lesser-included offense was committed.

> "That other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed.

> "This requirement of other evidence does not apply to proving the identity of the person who committed the crime and the degree of the crime. If other evidence shows that the charged crime or a lesser included offense was committed, the identity of the person who committed it and the degree of the crime may be proved by the defendant's statements alone.

> "You may not convict the defendant unless the People have proved his guilt beyond a reasonable doubt."

C. *Trial Court Did Not Err in Instructing the Jury Regarding the Corpus Delicti Rule*

Defendant contends the trial court should not have instructed the jury regarding the corpus delicti rule because it applies only to confessions and admissions, whereas his response to Ramirez denying the gun was real was exculpatory. In support, he purports to quote *Alvarez* for the proposition that the " 'corpus delicti rule *applies to both (1) actual confessions or a defendant's admissions*, and (2) preoffense statements of intent.' "

26

This quote is not from *Alvarez*, but rather, from an unreported appellate decision that cites and paraphrases *Alvarez*. (See *People v. Fisk* (May 25, 2007, No. A113509) [nonpub. opn.].) As we quoted from *Alvarez* above, the corpus delicti rule provides that "the prosecution cannot satisfy [its] burden [of proving the corpus delicti] by relying exclusively upon the *extrajudicial statements*, confessions, *or* admissions of the defendant." (*Alvarez, supra*, 27 Cal.4th at p. 1169, original italics omitted, italics added.) By listing "extrajudicial statements, confessions, or admissions" in disjunctive fashion, we presume each—including "extrajudicial statements"—has its own separate meaning. Thus, the corpus delicti rule is not as narrow as defendant suggests.

Even if the rule applies only to extrajudicial statements that are *inculpatory* (see *People v. Rivas* (2013) 214 Cal.App.4th 1410, 1431 (*Rivas*)), defendant's statement here *is* inculpatory. In the context of the defense theory at trial that defendant was not the shooter, evidence that Ramirez *asked defendant* (and not Reyes) a question about a gun while they were fleeing a party at which a shooting had just occurred was suggestive that defendant (and not Reyes) was the shooter, making defendant's response inculpatory. That his response—though superficially exculpatory—proved to be demonstrably false likely further inculpated him in jurors' minds. Defendant acknowledges in his opening brief that the jury likely drew this inference. Thus, even if the corpus delicti rule does not apply to exculpatory statements, defendant's extrajudicial statement does not fall within that exception.

On this record, the trial court did not err in sua sponte instructing the jury on the corpus delicti rule.

## D. *CALCRIM No. 359 Is Not Self-contradictory*

Citing the Sixth District Court of Appeal's decision in *Rivas, supra*, 214 Cal.App.4th 1410, defendant argues the third paragraph of CALCRIM No. 359, regarding the suspect's identity, was confusing and reduced the prosecution's burden of proof. The Attorney General argues defendant forfeited this challenge by not objecting below on this specific basis. We decline to declare a forfeiture. On the merits, we find no error.

The trial court in *Rivas* instructed the jury with a version of CALCRIM No. 359 that correctly recited the corpus delicti rule in the first two paragraphs, but then stated, "The identity of the person who committed the crime [and the degree of the crime] may be proved by the defendant's statement[s] alone." (*Rivas, supra*, 214 Cal.App.4th at 1428, fn. 5.) The *Rivas* court held the "identity" paragraph "requires reconsideration" because it "presents a risk of confounding the jury by telling jurors that a defendant's inculpatory extrajudicial statements, taken alone, do not suffice to allow the jury to convict the defendant of a charged crime—and yet those statements, again taken alone, are entertainable to prove the defendant's 'identity [as] the person who committed the crime' (CALCRIM No. 359, 3d par.), which to any juror can only mean the defendant's identity as the perpetrator, i.e., the guilty party." (*Id.* at p. 1429.) In so concluding, the *Rivas* court distinguished this "identity" wording as "quite different" from that in CALJIC No. 2.72, which the California Supreme Court upheld in *People v. Foster* (2010) 50 Cal.4th 1301 (*Foster*).[10] (*Rivas, supra*, 214 Cal.App.4th at p. 1429, fn. 8.)

---

[10] The jury in *Foster* was instructed that " '[t]he identity of the person who is alleged to have committed a crime is not an element of the crime nor is the degree of the crime.

28

However, in *People v. Rosales* (2014) 222 Cal.App.4th 1254, Division Five of the Second District Court of Appeal reviewed the purpose of the corpus delicti rule, disagreed with *Rivas,* and held the "identity" language in CALCRIM No. 359 was not confusing. (*Rosales*, at pp. 1260-1261.) The *Rosales* court observed the instruction "correctly states the law" regarding the distinct concepts of (1) the commission of a crime, and (2) the identity of the perpetrator, and concluded "[t]here is no danger a jury will be unable to separate the two rules any more than in CALJIC No. 2[.]72, which has been approved by our Supreme Court in *Foster*." (*Id.* at pp. 1260, 1261.)

We need not decide whether *Rivas* or *Rosales* is the better-reasoned case because the trial court here instructed the jury with a different version of CALCRIM No. 359 than was used in those cases—a version that was revised *in response* to *Rivas*. (Judicial Council of Cal., Crim. Jury Instns. (2015) Bench Notes to CALCRIM No. 359, p. 126.) The version the trial court used here recites the corpus delicti rule in the first two paragraphs, then explains the relationship between the corpus delicti and the identity of the perpetrator as follows: "Th[e] requirement of other evidence does not apply to proving the identity of the person who committed the crime and the degree of the crime. If other evidence shows that the charged crime or a lesser included offense was committed, the identity of the person who committed it and the degree of the crime may be proved by the defendant's statements alone." This treatment of the distinct concepts of the corpus delicti and the identity of the perpetrator is more akin to the version of

Such identity or degree of the crime may be established by an admission.' " (*Foster, supra*, 50 Cal.4th at p. 1344, fn. 19, italics omitted.)

CALJIC No. 2.72 that our Supreme Court upheld in *Foster* than to the earlier revision of CALCRIM No. 359 questioned in *Rivas* and upheld in *Rosales*. Accordingly, we conclude the trial court properly instructed the jury regarding the law, and did so in a way that was not likely to confuse jurors.

We likewise reject defendant's contention that CALCRIM No. 359 "lessened the prosecutor's burden of proof." The *Rivas* court rejected a similar challenge, explaining "the jury was told not to return any convictions that were not supported to its satisfaction by proof beyond a reasonable doubt." (*Rivas, supra*, 214 Cal.App.4th at p. 1431.) Similarly here, the trial court instructed the jury via at least three separate instructions that it could convict defendant only if it was convinced of his guilt beyond a reasonable doubt. (See CALCRIM Nos. 220, 224, 359.) We presume the jury followed these instructions. (See *People v. Smith* (2007) 40 Cal.4th 483, 517.)

IV. *Jury Instructions Regarding Provocation*

Defendant contends the trial court erred by instructing the jury only that an *objective* standard of provocation applies to reduce murder to voluntary manslaughter, without clarifying that a *subjective* standard of provocation applies to reduce first degree murder to second degree murder.[11] He maintains this lack of clarification likely led the

---

[11] We decline the Attorney General's request to find a forfeiture of this challenge based on defense counsel's failure to object during trial. "If the trial court provided misleading instructions to the jury, this error would affect the defendant's substantial rights. (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1331, fn. 2.)

jury to conclude erroneously that the objective standard also applied to reducing the degree of murder. We disagree.

As relevant here, the trial court instructed the jury regarding homicide (CALCRIM No. 500), malice aforethought (CALCRIM No. 520), the degrees of murder (CALCRIM No. 521), provocation-based second degree murder (CALCRIM No. 522), and voluntary manslaughter committed upon sudden quarrel or heat of passion (CALCRIM No. 570).[12]

More specifically, the trial court instructed the jury with CALCRIM No. 522 as follows:

> "Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter. The weight and significance of the provocation, if any, are for you to decide.
>
> "If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. Also, consider the provocation in deciding whether the defendant committed murder or manslaughter."

In CALCRIM No. 570, the trial court instructed the jury as follows regarding the objective standard of provocation that applies to reduce murder to manslaughter:

> "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.
>
> "The defendant killed someone because of a sudden quarrel or in the heat of passion if:

---

[12] The trial court also instructed the jury regarding voluntary manslaughter based on imperfect self-defense (CALCRIM No. 571), attempted voluntary manslaughter based on heat of passion (CALCRIM No. 603), attempted voluntary manslaughter based on imperfect self-defense (CALCRIM No. 604), justifiable homicide based on self-defense (CALCRIM No. 505), and the right to self-defense based on mutual combat (CALCRIM No. 3471).

31

"1.    The defendant was provoked;

"2.    As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his/her reasoning or judgment;

"AND

"3.    The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.

[¶] . . . [¶]

"It is not enough that the defendant simply was provoked.  The defendant is not allowed to set up (his) own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient.  In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment."

In *People v. Jones* (2014) 223 Cal.App.4th 995 (*Jones*), the court rejected the same argument defendant advances here.[13]  After discussing the instructions cited above, the *Jones* court addressed the differing burdens associated with reducing the degrees of murder compared with reducing murder to manslaughter:

"[A] subjective test applies to provocation as a basis to reduce malice murder from the first to the second degree:  it inquires whether the defendant in fact committed the act because he was provoked.  The rationale is that provocation may negate the elements of premeditation, deliberateness and willfulness that are required for that degree of the crime.  [Citation.]  But more is required to reduce malice murder to voluntary manslaughter.  For that, an objective test

---

13    Although *Jones* is directly on point, defendant did not address it in his opening brief.  He acknowledges in reply that "*Jones* addresses the same question raised here by [defendant]."

also applies:  the provocation must be so great that, in the words of CALCRIM No. 570, it 'would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.' "  (*Jones, supra*, 223 Cal.App.4th at pp. 1000-1001.)

With these differing standards in mind, the *Jones* court concluded:

"[T]he instructions are correct.  They accurately inform the jury what is required for first degree murder, and that if the defendant's action was in fact the result of provocation, that level of crime was not committed.  CALCRIM Nos. 521 and 522, taken together, informed jurors that 'provocation (the arousal of emotions) can give rise to a rash, impulsive decision, and this in turn shows no premeditation and deliberation.'  [Citation.]  As the jury also was instructed, a reduction of murder to voluntary manslaughter requires more.  It is here, and only here, that the jury is instructed that provocation alone is not enough for the reduction; the provocation must be sufficient to cause a person of average disposition in the same situation, knowing the same facts, to have reacted from passion rather than judgment."  (*Jones, supra*, 223 Cal.App.4th at p. 1001.)

We find *Jones* persuasive and dispositive of defendant's challenge.  Consequently, we conclude the trial court did not err.

V.  *No Instructional "Gap" Regarding Express Malice Second Degree Murder*

Defendant contends the trial court erroneously instructed the jury by failing to explain the concept of second degree murder with express malice, leading the jury to believe that if defendant killed with express malice he could be guilty of only first degree murder.  He bases this argument on *People v. Rogers* (2006) 39 Cal.4th 826 (*Rogers*), in which the California Supreme Court found that the omission of CALJIC No. 8.30 regarding express malice second degree murder "created an obvious gap that was not filled by any of the other instructions given."  (*Rogers*, at p. 867.)  We find *Rogers* distinguishable, and conclude the jury was adequately instructed.

33

The trial court in *Rogers* "gave the jury the options of convicting defendant of first degree murder, second degree murder, or voluntary manslaughter. It instructed the jury on the elements of murder and on the principle that murder may be committed with either express or implied malice. (CALJIC Nos. 8.10 and 8.11.) It explained that first degree murder is a willful, deliberate, and premeditated killing. (CALJIC No. 8.20.)" (*Rogers, supra*, 39 Cal.4th at p. 866.) The *Rogers* trial court also instructed regarding second degree murder based on *implied* malice (CALJIC No. 8.31), but *did not* instruct on second degree murder based on *express* malice (CALJIC No. 8.30).[14] (See *Rogers, supra*, at p. 866.) The California Supreme Court found error, noting:

> "The jury could have concluded the emotional, impulsive nature of the killing precluded a finding of premeditation and deliberation but that defendant nevertheless intended to kill. Based on this evidence, the trial court should have given CALJIC 8.30. Indeed, the trial court did include references to both express malice and implied malice in the definition of murder. Although it explained that murder with implied malice is 'also' second degree murder, and that implied malice does not require an intent to kill, it failed to explain that a murder committed with express malice could constitute second degree murder. The omission of CALJIC 8.30 created an obvious gap in the instructions that was not filled by any of the other instructions given." (*Rogers, supra*, 39 Cal.4th at p. 867.)

There was no similar instructional "gap" here. CALCRIM No. 520 instructed the jury that malice is an element of murder; malice can be either express or implied; the defendant acted with express malice if he "unlawfully intended to kill"; and that if the

---

14    CALJIC No. 8.30 explained that second degree murder also occurs when "there is manifested an intention unlawfully to kill a human being but the evidence is insufficient to establish deliberation and premeditation." (See *Rogers, supra*, 39 Cal.4th at p. 866.) The *Rogers* prosecutor initially requested this instruction, but later withdrew the request. (*Ibid*.)

34

jury decides defendant is guilty of murder, it should find him guilty of second degree murder unless the People have proved him guilty of first degree murder. This instruction, standing alone, adequately informed the jury it could find defendant guilty of second degree murder even if it found he acted with express malice.

The trial court's instruction regarding first degree murder reinforces our conclusion. (See *People v. Ramos, supra*, 163 Cal.App.4th at p. 1088 [reviewing court considers jury instructions as a whole].) CALCRIM No. 521 explained that defendant is guilty of first degree murder only if the jury finds he acted "willfully, deliberately, and with premeditation." Absent such a finding, the instruction explained the jury could only find defendant guilty of second degree murder. In such case, CALCRIM No. 521 referred the jury back to CALCRIM No. 520 as follows: "The requirements for second degree murder based on express or implied malice are explained in CALCRIM No. 520, *First or Second Degree Murder With Malice Aforethought*." This instruction makes clear the jury was informed it could convict defendant of second degree murder based on an express malice theory.

DISPOSITION

The judgment is affirmed.


_____
                                                    HALLER, Acting P. J.

WE CONCUR:


_____
                        McDONALD, J.


_____
                        AARON, J.